784 So.2d 1003 (2001)
Kenneth SMITH, Appellant,
v.
NOBLE DRILLING (U.S.), INC., Appellee.
No. 2000-CA-00476-COA.
Court of Appeals of Mississippi.
May 8, 2001.
Mark W. Davis, Abigail Susannah Marshall, Attorneys for Appellant.
James H. Heidelberg, Pascagoula, Robert Michael Cunningham II, Attorneys for Appellee.
BEFORE KING, P.J., PAYNE, and MYERS, JJ.

PROCEDURAL HISTORY
PAYNE, J., for the Court:
¶ 1. On March 18, 1999, Kenneth Smith filed a premises liability/negligence action against Noble Drilling for injuries sustained on July 13, 1998, from an on-the-job accident. Noble moved for summary judgment which was granted by the Circuit Court of Jackson County after a hearing in March 2000. Smith appeals from the summary judgment. Finding no error, this Court now affirms.

*1004 FACTS
¶ 2. Smith was employed as a shipfitter by HAM Marine, Inc., and was injured while working on an oil rig owned and operated by Noble Drilling. Noble and HAM entered into a contract on August 29, 1997, for repairs and modifications to the oil rig while located at HAM's shipyard in Pascagoula. Smith was climbing a metal ladder within a stability column of the rig when the ladder came in contact with a bare spot on one of a number of welding lines running down the ladder way. The welding lines were the property of HAM. The contact sent an electrical current through the ladder, shocking Smith and causing him to fall about twenty feet. He suffered injuries to his head, face, jaw, and left wrist.
¶ 3. Smith filed suit against Noble alleging that, as owner of the rig, Noble Drilling was negligent by failing to provide Smith with a safe work environment; failing to provide safe welding lines; failing to warn him of the dangerous condition of the welding lines; and failing to provide him with a safety harness to prevent falls.
¶ 4. The Circuit Court of Jackson County found that Smith was injured by faulty welding lines provided by HAM, not Noble; that HAM failed to warn of the condition of the lines, if such warning was necessary since Smith had tried to repair a line at some point prior to the fall; and that Smith himself decided not to use fall protection on the ladder. The court further stated that without some showing of control by Noble, Smith cannot prevail on his claim.

ISSUES PRESENTED

STANDARD OF REVIEW
¶ 5. Smith made the following assignments of error:
I. THE TRIAL COURT ERRED IN ITS DETERMINATION THAT NOBLE DRILLING DID NOT HAVE CONTROL OVER HAM MARINE'S WORK.
II. THE TRIAL COURT ERRED IN ITS DETERMINATION THAT NOBLE'S CONTRACT WITH HAM MARINE DOES NOT REQUIRE HAM MARINE TO FOLLOW NOBLE'S SAFETY PROCEDURES.
¶ 6. The standard of review on an appeal from summary judgment is de novo, as set forth in Aetna Cas. and Sur. Co. v. Berry, 669 So.2d 56, 70 (Miss.1996). The proponent of a summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. M.R.C.P. 56(c); Collier v. Trustmark Nat'l Bank, 678 So.2d 693, 696 (Miss.1996). The non-movant may not defeat the motion merely by responding with general allegations, but must set forth in an affidavit or otherwise, specific facts showing that issues exist which necessitate a trial. Drummond v. Buckley, 627 So.2d 264, 267 (Miss.1993). The evidence must be viewed in the light most favorable to the party against whom the summary judgment motion was made. Quinn v. Mississippi State Univ., 720 So.2d 843 (¶ 10) (Miss.1998).

DISCUSSION

I. DID NOBLE DRILLING HAVE CONTROL OVER HAM MARINE'S WORK.
¶ 7. "Where the owner surrenders to the contractor all control over the performance of that aspect of the work that gives rise to the injury, there is ... no liability." Lambert v. Georgia-Pacific Corp., 32 F.Supp.2d 914, 917 (S.D.Miss. 1999). Smith argues, under this Court's case of Vu v. Clayton, 96-CA-00408-COA (Miss.Ct.App., July 20, 1999), that the extent *1005 to which a premises owner has surrendered control is a matter for a jury to consider. In that case, an independent contractor fell through the floor of an attic in which he was installing an air conditioner. This Court reversed a directed verdict for the defendant building owner stating that there was no evidence that the contractor was given unfettered control of the premises and the work he conducted, the jury could have found in favor of the contractor, and at the very least, the extent to which control was surrendered was a matter for the jury to consider. Id. at (¶ 11). However, the Mississippi Supreme Court reversed this Court, and reiterated that the party in the best position to eliminate a dangerous condition should be charged with that responsibility, stating:
In contrast to [the defendants'] absence of knowledge of the conditions in the attic, Vu had been in the attic approximately ten times over the course of two days. He had twenty years of experience in climbing into attics. In Tharp v. Bunge Corp., 641 So.2d 20 (Miss.1994), this Court eliminated the open and obvious defense in premises liability actions. However, the Court held that "[t]he party in the best position to eliminate a dangerous condition should be burdened with that responsibility." Id. at 25.
Vu v. Clayton, 765 So.2d 1253 (¶ 11) (Miss. 2000). Noble contends that in this case, the party in the best position to observe and correct a defective welding line was Smith and his employer HAM Marine.
¶ 8. The Vu court also stated:
Because Vu failed to show any knowledge, either actual or constructive, on the part of either [defendant] of the allegedly dangerous condition in the attic and because the risk of falling through the ceiling was intimately connected with repair work in the attic, the trial court correctly directed a verdict in favor of [the defendants].
Id. at (¶ 15). Noble contends that Smith and his employer were in the best position to eliminate any dangerous condition created by HAM's welding leads. In his deposition, Smith testified that he had seen and taped a bad welding lead because he did not want anyone to get hurt. When asked who the welding lead belonged to, Smith said "HAM Marine." Smith testified that he obtains tools and safety harnesses from HAM's tool room, and that he felt he needed a safety harness the day of the injury, and every day. Smith also testified that no Noble employee had been in the area the day of his injury.
¶ 9. The Vu court further reiterated that a property owner is not under any duty to protect against risks arising from or intimately connected with defects of the premises, or of the machinery or appliances located thereon, which the contractor has undertaken to repair. Id. at (¶ 12) Also, the court noted that a property owner is not an absolute insurer of an invitee's safety and is not liable for conditions which should have been known by the business invitee. Vu, 765 So.2d at (¶ 13). Noble contends that Smith admittedly had actual knowledge of the defect in the welding lines and the placement of the leads. The defective leads belong to HAM and the use thereof is a task intimately connected with carrying out the construction work. Noble argues that to hold it liable for Smith's injuries would make Noble an absolute insurer of Smith's safety.
¶ 10. Smith contends that there is enough evidence with which a jury could reasonably conclude that HAM did not have unfettered control over the work it performed for Noble. Noble argued through its agent, Grady Pittman, that because HAM's work was new construction, Noble had no reason to go into that *1006 area. Smith claims that Pittman then stated that although he had not been in the area where Smith was working, he would not commit to an answer that no one else from Noble had been there. Pittman stated that Noble's employee in charge of safety, Robert Bourque, would not go into an area where Noble personnel were not working unless he knew it was safe or unless he was asked to go. Smith, however, stated in his deposition that he saw Noble's safety man every day. Smith stated that Bourque would be walking around "up top." Smith contends that when reading Pittman's deposition, it appears that Bourque was supervising personnel either in an area where he did not belong or else was told to be there. Smith claims that this conduct illustrates control beyond that which Noble would have this Court to believe.
¶ 11. Noble points out that Smith testified in his deposition that Noble's safety man did not direct him in any manner with regard to any type of job that Smith performed. Smith admittedly did not receive direction from Noble's supervisory personnel and did not ask Noble for safety equipment. John Perranich, structural superintendent for HAM, stated by affidavit that at all times pertinent to the litigation, Smith was under his supervision, or that of another HAM employee, Tim Beech. If Smith reported an unsafe practice or condition, Smith stated that it would be to HAM's safety man, and that he would go to HAM's tool room for safety equipment.
¶ 12. Noble contends that not even Smith believes his contention that Noble was exercising control over HAM's work. Further, under the terms of the contract, Noble had employees living and working onboard the rig during this time. The contract states that "all CONTRACTOR's (HAM's) published safety rules and regulations shall be followed." Noble argues that the deck is the place where Noble personnel were present, living and working on the rig. Smith stated that he saw Bourque "up top" walking around. "Up top" is the deck of the rig, not the work area in the stability column.
¶ 13. Smith points out that Noble admitted that if it asked HAM to do something on the rig, HAM did it. An example given by Noble's 30(b)(6) designee, Pittman, was that if HAM's welding lines were lying across the deck, Noble would ask them to use trees to get the lines off the ground. Additionally, each Friday Noble would have HAM to do a 100% rollback of their leads [rolling the machine lines back to the equipment] to avoid creating bigger piles of lines, and to "keep them under control to keep safe walkways." Smith asserts that these examples demonstrate the control Noble had over safety aspects of HAM's operations. This is unpersuasive; it does not speak to where or how HAM did its work. Additionally, Smith claims that after the injury, Noble performed an investigation, completed an accident report, and recommended that HAM re-route the welding lines and install fall protection devices. Mark Ekes, safety man for HAM, stated by affidavit that after the accident, all welding lines were pulled from the area, tested, and rerouted by HAM personnel at the direction of HAM safety personnel.
¶ 14. The contract states that HAM "shall furnish all labor, material, supplies, equipment, and services required in connection with the work and shall redeliver the rig to Noble at HAM's shipyard upon completion of the work." The rig was turned over to HAM for the work to be done, per the language of the contract, and HAM was charged with the duty of initiating and maintaining safety programs. Smith has failed to show the control necessary to hold Noble Drilling, Inc., liable for *1007 this injury. The decision of the lower court, therefore, is affirmed on this issue.

II. DID NOBLE'S CONTRACT WITH HAM MARINE REQUIRE HAM MARINE TO FOLLOW NOBLE'S SAFETY PROCEDURES.
¶ 15. The provision regarding safety in the contract between Noble and HAM states as follows:
CONTRACTOR shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with this agreement. Contractor and Owner shall comply with Noble Drilling and/or HAM Marine's Safety Policy and Procedure Manuals. The Contractor and Owner shall exchange manuals.
Smith contends that HAM employees must comply with Noble's safety rules. Noble's Safety Manual states:
Fall Protection is to be used whenever personnel are required to work from elevated positions six feet ... and more above the deck. All Noble employees, as well as Noble subcontractor employees, are expected to follow the requirement of the Fall Protection Program.
Smith claims that Noble takes the position that HAM is the contractor, and not a subcontractor, and that the plain language of the contract clearly shows that HAM was charged with the duty of initiating, maintaining, and supervising all aspects of safety precautions and programs. Smith asserts that this is totally contrary to the language in the contract which specifically states that Noble and HAM employees shall follow the safety rules of both entities. Smith argues that Noble takes such a position because Bourque, Noble's safety man, patrolled the area on a regular basis and would have seen that no fall protection devices were being used.
¶ 16. Noble points out that Article VI of the agreement calls for the following of all of HAM's published safety rules and regulations by Noble should Noble perform any work on the rig while docked in HAM's shipyard. Noble claims that Smith is attempting to create factual issues by argument and assertions in light of evidence to the contrary contained in the deposition testimony and contractual language between Noble and HAM. The court in Magee v. Transcontinental Gas Pipe Line Corp., 551 So.2d 182, 186 (Miss.1989), stated that a party opposing summary judgment "may not create an issue of fact by arguments and assertions in briefs or legal memoranda." Noble asserts that the terms of the contract clearly state that HAM is the contractor, i.e. general contractor. Mark Ekes, HAM's safety man, testified that at all times pertinent to this litigation, HAM's safety policies and procedures were in effect for all HAM employees and HAM provided all safety equipment to its employees. Even assuming that Noble's manual was to be followed by HAM, the contractual duty of initiating, maintaining and supervising all safety precautions and programs was charged to HAM. Furthermore, even if Noble's manual was to be followed, Smith admittedly and knowingly violated the requirement to use fall protection devices. Noble contends that Smith's argument amounts to "stop me before I hurt myself when I do not follow the applicable safety rules."
¶ 17. Noble's answer could basically be a demurrer to this assignment of error. Even if Noble's safety policy was to be followed under the contract, it was HAM's duty to initiate, maintain, and supervise all safety precautions. HAM provided the equipment and supervised its own employees. Smith violated the safety procedures, admitting that fall protection was needed. The rig was located in HAM's shipyard at the time of the injury, and under the contract, *1008 the rig had been delivered to HAM's control for all intents and purposes of the construction. Even if it were error to find that HAM Marine was bound to follow Noble's safety policies, it was harmless error. There being no merit to this issue, the decision of the circuit court is affirmed.

CONCLUSION
¶ 18. Smith failed to show that Noble Drilling, Inc., retained the control necessary to be held liable for this injury. Whether HAM Marine was to follow Noble's safety policies or not, HAM was still charged with the duty to initiate, maintain, and supervise all safety precautions, thus removing Noble's liability under Smith's second argument. The decision of the Circuit Court of Jackson County to grant summary judgment is, therefore, affirmed.
¶ 19. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS and CHANDLER, JJ., CONCUR.